**IN THE COURT OF APPEALS OF IOWA**

No. 25-0444
Filed August 6, 2025

**IN THE INTEREST OF L.N., A.N., H.N., and R.N.,**
**Minor Children,**

**C.N., Father,**
        Appellant,

**C.E., Mother,**
        Appellant.
_____

Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, Judge.

A mother and father each appeal the termination of their parental rights to their four children. **AFFIRMED ON BOTH APPEALS**.

Robert W. Davison, Cedar Rapids, for appellant father.

Allison C. Ackerman of Nidey Erdahl Meier & Araguas, PLC, Cedar Rapids, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Annette F. Martin, Cedar Rapids, attorney for minor children.

Robin Himes of Linn County Advocate, Cedar Rapids, guardian ad litem for minor children.

Considered without oral argument by Tabor, C.J., and Ahlers and Langholz, JJ.

**LANGHOLZ, Judge.**

Four children were removed from their mother's and father's custody at the beginning of 2023 over concerns about domestic abuse, substance use, and lack of proper supervision and care of the children.[1]  But this was not the first time the children were removed from the parents' custody—by the time of the termination hearing, the family had been part of three child-in-need-of-assistance ("CINA") cases and the Iowa Department of Health and Human Services ("HHS") had conducted thirty assessments of the family.  So twelve years after the family's first involvement with HHS, the juvenile court found that the children could not be safely returned to either parent.  And the court terminated both parents' parental rights.  Each now appeals.

On our de novo review, we agree with the juvenile court.  The State proved the statutory grounds for terminating the mother's and father's parental rights under paragraphs "f" and "h" of Iowa Code section 232.116(1) (2024) because the children could not be returned to either parent's care at the time of the termination hearing.  And terminating their parental rights is in the best interests of the children because the parents have shown they are unable to make any long-lasting changes that would provide the children with stability, and the children are finally receiving that stability and permanence in their foster home after all these years.  We thus affirm on both appeals.

---

[1] We avoid using the parties' names to respect their privacy because this opinion—unlike the juvenile court's order—is public.  *Compare* Iowa Code § 232.147(2) (2025), *with id.* §§ 602.4301(2), 602.5110; *see also* Iowa Ct. R. 21.25.

## I.    Background Facts and Proceedings

In the summer of 2013, a then-twenty-three-month-old son and nine-month-old daughter and their parents came to the attention of HHS because of safety concerns—domestic violence between the mother and father while the children were around, both parents' substance use, the mother's mental health, and denial of critical care to the children.  The children were removed from the mother's and father's custody in September 2013 and were placed in foster care.  About two years later, this first case ended with a bridge order placing the children in the mother's sole legal custody and restricting the father to fully supervised visits.

But then in November 2019, the family was back in juvenile court because of allegations of denial of critical care and failure to provide proper supervision based on another domestic violence incident between the mother and father.  The mother and father had welcomed another daughter in September 2017, so this next CINA case involved three children.  And the children were again removed from their father's custody.  The mother and father had their fourth child—a son—in March 2021.  The case closed in September 2021, with both the mother and father having custody of all four children.

The family's current involvement with the juvenile court began in January 2023, after the family again came to HHS's attention because of another domestic violence incident between the mother and father—one of the children was present while the father punched the mother in the stomach.  There were also concerns that one child was malnourished and another child was not receiving appropriate supervision or hygiene.  The children were adjudicated children in need of assistance the next month.

4

At first, the children remained in the mother's and father's custody. But the children were removed in March 2023. At the time, the children were living primarily with the mother. Her home was in "very poor condition," as the floors were dirty and covered in trash. And there were again concerns that the mother's mental health was preventing her from meeting the children's needs, specifically their medical needs. A few months later, the mother was arrested and charged with domestic assault causing bodily injury to the father after breaking into his home and assaulting him and his girlfriend while the children were in the house. This was at least the second time that the mother had violated a no-contact order between her and the father. The mother was held in contempt for violating court orders, and her visits were moved to fully supervised.

After a trial home placement with the father, the children were returned to his custody in July 2023. Unfortunately, the children were removed again less than five months later. The father failed to comply with drug testing and refused to provide receipts for the legal cannabis products he bought, as he was required to do. The father also moved in with his girlfriend and lied about it to HHS. And there was a domestic violence incident between the father, who was intoxicated, and the girlfriend while one of the children was present.

The father was given another chance with a second trial home placement in February 2024. But the children were removed again only five days later—the father and the girlfriend were again involved in a domestic violence incident, where the father strangled and hit the girlfriend while two of the children were sleeping. The children were then placed with the girlfriend. The mother still had only fully supervised visits with the children, and she did not have stable housing.

Within the month, the children were removed from the girlfriend's care because the father was back living in her home. The children were then placed in foster care.[2] Both parents were approved for semi-supervised visits at this time.

Since HHS's involvement, the father has struggled with substance use. The father received a substance-use evaluation that recommended treatment, which he never completed. The father has been ordered to drug test four times a month for almost the entire time HHS has been involved, but as noted by an HHS worker, he did not start complying regularly until August 2024 "when there was talk of termination and permanency for the children." Those drug tests have all been positive for marijuana. The father has a medical cannabis card and must substantiate his legal medical use by providing HHS with dispensary receipts, but he has rarely done so. The father testified that he uses marijuana once a day and he acknowledges that drinking is "not good" for him. And he had no explanation for how two of the children tested positive for marijuana while in his care in December 2023. And in September 2024, the father had tested positive for alcohol despite reporting to HHS that he was not drinking. The father also reported that he is still in a relationship with the girlfriend, even though HHS has concerns about the girlfriend's drinking and how that could affect the father's ability to stay sober.

The mother has struggled with stable housing and her mental health throughout the case. An HHS worker reported that the mother did not address her mental health issues for a long time, but she has been following through consistently with therapy since around September 2024. The mother has been

---

[2] At first, the children were placed in separate foster homes. But they were ultimately placed together in their current foster home in August 2024.

homeless several times and has lived with other people at various points. From March 2023 to November 2024, the mother did not have appropriate housing for the children to have visits at. But she bought a trailer in August 2024. And she fixed it up by November so the children could visit there.

Both parents have been the perpetrators and criminally charged with domestic violence towards each other. And the father has also had domestic violence incidents with his girlfriend, and drinking is typically involved during those events. The father completed the court-ordered Iowa Domestic Abuse Program in November 2024 after first failing to complete the program.

The parents have been mostly consistent with attending their scheduled visits with the children. But HHS has persistent concerns about the mother's and father's ability to manage all four children at the same time.

In September 2024, with the parents still only up to semi-supervised visits, the State petitioned for the termination of the mother's and father's parental rights. By the time of the two-day termination hearing in January and February 2025, the children were thirteen, twelve, seven, and three years old. The father and mother both testified. A family support specialist, an HHS worker, and the children's former school counselor also testified at the hearing. The children's guardian ad litem recommended termination. And the juvenile court agreed, terminating the parental rights of both parents to the children.

The juvenile court found that the State proved grounds for termination of both parents' rights under paragraph "f" of Iowa Code section 232.116(1) for the three older children and paragraph "h" of the same section for the youngest child. The court found that the children were in the appropriate age ranges for each

provision, were adjudicated as children in need of assistance, had been removed from the mother's and father's custody for more than a year, and could not be safely returned at that time. The court reasoned that while the parents had made some progress, they "waited until the specter of termination" to make changes. And given "the whole of the children's history, the length of time the parents have demonstrated their current levels of stability is not very significant." The court further explained, "[t]he parents seem able to manage for short periods of time, but not for any prolonged amount, with concerns reaching HHS nearly annually for the past 13 years."

The court also found that it was in the children's best interests for both parents' parental rights to be terminated, reasoning that the children have "been subject to HHS involvement and/or Court supervision for all but approximately 1.5 of the past 12 years," and the services that have been offered to the parents "have not resulted in any long-term change or stability." The court also considered the children's need for "consistent stability," the parents' inability or unwillingness to provide it, and "the stability in their current foster home." And the court reasoned that "the likelihood of continued exposure to domestic violence, substance use and unstable mental health and that resulting trauma, far outweighs the trauma of termination." So the court summed up, "[i]t is not in the children's best interest[s] to give up a placement in which they have thrived and felt secure and loved, for the Hail Mary of giving one more chance to their parents."

Finally, the court declined to apply any of the statutory exceptions to termination under Iowa Code section 232.116(3). Both parents now separately appeal the juvenile court's order terminating their parental rights to the children.

## II. The Mother's Appeal

Terminating parental rights under Iowa Code chapter 232 follows a three-step process. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). First, the State must prove a statutory ground for termination. *Id.* Second, the State must show that termination is in the best interests of the child. *Id.* And finally, the parent bears the burden to show whether a discretionary exception applies that should preclude termination. *Id.* We review a termination decision de novo, giving "respectful consideration" to the juvenile court's fact findings, especially when based on credibility determinations. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). On appeal, the mother challenges the juvenile court's rulings on the first two steps of this process: (1) whether the State proved the ground for termination under paragraphs "f" and "h" of Iowa Code section 232.116(1) and (2) whether termination is in the best interests of the children.

*Ground for Termination*. Termination is proper under paragraph "h" of section 232.116(1) when a child is three years old or younger, has been adjudicated a child in need of assistance, has been removed from the physical custody of their parents for six of the last twelve months, and "[t]here is clear and convincing evidence that the child cannot be returned to the custody of the child's parents . . . at the *present time*." Iowa Code § 232.116(1)(h) (emphasis added); *see also In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (explaining that the issue is whether the child could be returned "at the time of the hearing"). Under paragraph "f," a parent's rights to a child four years old or older may be terminated based on the same factors as "h," except the child must have been removed from the physical custody of their parents for twelve of the last eighteen months, or the

previous twelve consecutive months. *See* Iowa Code § 232.116(1)(f). So here, the juvenile court relied on paragraph "h" as the termination ground for the youngest child and paragraph "f" for the older three.

The mother challenges only whether there was clear and convincing evidence that the children could not be returned to her custody. As this element is the same under both paragraphs, we consider all four children together. And we agree with the juvenile court that there is clear and convincing evidence that the children could not be returned to the mother's care at the time of the hearing. To be sure, the mother has made some progress with her mental health, and we commend her for those efforts. But, despite that recent progress, it was not safe to return the children to the mother's care at the time of the hearing.

The evidence shows that over the past twelve years the mother has had a pattern of short-term progress and then regress—never achieving long-term stability. While the mother started attending therapy consistently in September 2024, this has not been true over the life of this case, as she previously "express[ed] that she didn't need to attend therapy." And we agree with HHS's assessment—based on its observations of her interactions with the children—that the mother cannot yet take care of all four children on her own. While the mother has taken "positive steps to turn her life around in the months prior to the termination hearing, these steps do not eliminate her past." *See In re C.B.*, 611 N.W.2d 489, 494 (Iowa 2000). Based on the lack of long-term progression, we cannot say the children could have been safely returned to the mother's care at the time of the termination hearing.

*Best Interests of the Children*. The best interests of the children is the "paramount concern in a termination proceeding." *L.B.*, 970 N.W.2d at 313. We consider both the children's long-range and immediate best interests. *See In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997). And we must give "primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2); *see also In re M.W.*, 876 N.W.2d 212, 224 (Iowa 2016).

We are mindful of "the harms that occur when children are taken from their parents." *In re D.C.*, No. 24-1258, 2024 WL 4503211, at *3 (Iowa Ct. App. Oct. 16, 2024). Yet we must also keep in mind the need to keep "children from languishing in foster care." *In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially). As we often stress, "[t]he crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems." *In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987). And our child-welfare laws demand that parents "assume their parental responsibility quickly" and prioritize "prompt efforts to terminate parental rights if those deadlines are not met." *J.E.*, 723 N.W.2d at 801.

Again, we agree with the juvenile court that termination is in the children's best interests. Since 2013, there has only been one year-and-a-half period when neither HHS nor the juvenile court has been part of the children's lives. Indeed, not until the children were placed together in their current foster home have they experienced any meaningful consistency or stability. Services and chances have

been provided to the mother for twelve years, and these services have not resulted in the mother making any real long-term changes.

Our analysis might be different if we were in the infancy of all these court proceedings. But we must consider the entirety of the mother's history, and her recent progress within the last few months does not overcome the prolonged challenges and harms to the children over the last twelve years. We do not doubt that the mother loves the children, but it is in their physical, mental, and emotional best interests for the mother's rights to be terminated. The stability they are receiving in their foster care placement is the stability they need and deserve. We thus affirm the juvenile court's termination of the mother's parental rights.

**III.    The Father's Appeal**

In his appeal, the father also challenges the juvenile court's statutory grounds and best-interests findings.[3]

*Ground for Termination.* Like the mother, the father argues that the juvenile court erred in terminating his parental rights under paragraphs "f" and "h" of Iowa Code section 232.116(1) because the children were not at "risk of any harm at the time of trial." But again, we agree with the juvenile court that there is clear and

---

[3] In his petition on appeal, the father makes several references to guardianship as an alternative to termination. But he did not include the refusal to establish a guardianship as one of his separately enumerated issues on appeal, nor did he provide sufficient argument and authority for us to consider it. He also includes an argument about the parent-child-bond statutory exception mixed in with his best-interests arguments. But again, he did not separately assert this as a claim of error. *See In re L.A.*, 20 N.W.3d 529, 534 n.2 (Iowa Ct. App. 2025) (en banc). Nor did he preserve error by asking the juvenile court to apply that exception. *See In re J.R.,* 20 N.W.3d 839, 843 (Iowa Ct. App. 2025) (en banc).

convincing evidence that the children could not be returned to the father's care at the time of the hearing.

The father has struggled with substance use throughout the past twelve years. And at the time of the hearing, he had completed none of his recommended treatment. Two of the children tested positive for marijuana in December 2023 after being in the father's care, and when asked how this happened his response was "I don't know, to be honest." Despite the children testing positive, he testified that he does not plan to stop using marijuana daily if the kids are returned to him. And he only consistently started engaging in drug testing in August 2024.

The father also has a long history of domestic violence. Across multiple trial home placements, the children were exposed to domestic violence in the home. What's more, we agree with HHS's assessment that the father has not shown he can safely parent the four children on his own. As with the mother, we acknowledge the father has taken some recent steps in the right direction. But this short-term progress still does not mean the children could be safely returned at the time of the termination hearing.

*Best Interests of the Children*. We also agree with the juvenile court that termination of the father's parental rights is in the children's long-term and immediate best interests. The father has not shown long-term stability or ability to provide the children with a safe, sober, and violence-free home. And he has not taken accountability for his actions that have led to this point. To be sure, the father and the children have a close bond. But despite years of offered services, the father has not made the lasting changes needed to safely parent the children. The children's physical, mental, and emotional needs will be best served by

terminating the father's parental rights so the children may achieve permanency once and for all. We thus affirm the juvenile court's termination of the father's parental rights.

**AFFIRMED ON BOTH APPEALS**.